NEW JERSEY BUILDERS ASSOCIATION AND NEW JERSEY REALTORS ASSOCIATION, CORPORATIONS OF THE STATE OF NEW JERSEY *ET AL.*, APPELLANTS, v. JAMES J. SHEERAN, COMMISSIONER OF INSURANCE *ET AL.*, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued December 18, 1978—Decided May 18, 1979.

238

Before Judges ALLCORN, SEIDMAN and BOTTER.

*Mr. Jay M. Hollander* argued the cause for appellants (*Messrs. Hutt, Berkow, Hollander & Jankowski,* attorneys; *Mr. Hollander* on the brief).

*Mr. Frank P. Mancino* argued the cause for intervenor Association of Real Estate Attorneys (*Messrs. Stockman, Mancino, Marinari, Smithson & O'Donnell,* attorneys; *Mr. Mancino* on the brief).

*Mr. William J. Begley* argued the cause for intervenor The Association of Title Insurance Agents (*Messrs. Begley & Begley,* attorneys).

*Mr. Jasper J. Jackson,* Assistant Deputy Public Advocate, argued the cause for the New Jersey Department of the Public Advocate (*Mr. Stanley C. Van Ness,* Public Advocate, attorney; *Mr. Jackson,* of counsel and on the brief).

*Mr. Kenneth R. Stein* argued the cause for intervenor New Jersey State Bar Association (*Messrs. Clapp & Eisenberg,* attorneys; *Mr. Stein* on the brief).

*Ms. Maureen McGrath,* Deputy Attorney General, argued the cause for respondent Commissioner of Insurance (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Ms. McGrath* on the brief).

*Mr. John R. Weigel* argued the cause for respondent New Jersey Land Title Rating Bureau (*Mr. John R. Weigel* and *Mr. Joseph M. Clayton, Jr.,* attorneys; *Mr. Clayton* on the brief).

The opinion of the court was delivered by

SEIDMAN, J. A. D. This appeal involves a challenge to a schedule of interim rates and fees for title insurance approved by the Commissioner of Insurance on June 15, 1978. The contentions of appellants New Jersey Builders Association and New Jersey Realtors Association, and of the several intervenors who have joined them in opposition to the schedule, are essentially these: (1) that the Commissioner is without authority to adopt interim rates absent an emergency situation; (2) that the Commissioner, instead of approving submitted rates and fees, had promulgated his own in a manner contrary to his statutory authority; (3) that the Commissioner failed to hold a plenary hearing before approving the schedule; (4) that the regulation of fees charged by title insurance companies would violate the antitrust laws and constitute unauthorized practice of law, and (5) that the Commissioner's action in approving the schedule was not reasonably based on adequate findings.

The history of this litigation begins with the adoption of the Title Insurance Act of 1974, *N. J. S. A.* 17:46B–1 *et seq.,* which we described in *N. J. Land Title Ins. Rating Bur. v. Sheeran,* 151 *N. J. Super.* 45, 48 (App. Div. 1977), as representing "the first comprehensive regulation of title insurance companies doing business in this State, and which requires, among other things, that rates charged by such insurers comport with filed rate schedules which have been first approved by the Commissioner of Insurance." We related in that case the action taken by the Commissioner following the enactment of the statute:

* * * [A]lthough the effective date of the act was May 29, 1975, the Commissioner was accorded the express power to suspend the

operation of all or any part thereof for a period of up to 90 days thereafter. Further, *N. J. S. A.* 17:46B–42(d), relating to rate filing, provides for an additional 90-day grace period. The Commissioner having exercised his authority to suspend the operation of the rate filing provisions for the full 90 days, the additional 90-day grace period provided by *N. J. S. A.* 17:46B–42(d) did not expire until November 26, 1975, namely, 180 days following the stated effective date of the act.

In the meantime, and pursuant to *N. J. S. A.* 17:46B–46, the New Jersey Land Title Insurance Rating Bureau (Rating Bureau), appellant herein, was formed to represent 18 of the 20 title insurance companies doing business in New Jersey. Rating Bureau undertook the preparation of a rate schedule for its members, discussing its work in progress with representatives of the Department of Insurance during the summer and into the fall of 1975. Its first filing was made on October 20, technical revisions thereof were filed on October 22, and finally, on November 25, the day before the legislatively anticipated effective date of the filed rates, a substantial group of revisions was filed. Obviously the 24 hours remaining after the final filing could hardly have allowed the Commissioner to commence, no less complete, the thorough review contemplated by the act prior to his approval or disapproval of the filed rates. *N. J. S. A.* 17:46B–45. Accordingly, the Commissioner advised Title Bureau that although the rates were not and could not yet be approved, the title companies could nevertheless use the filed rates pending his further action. He also advised Rating Bureau that pursuant to the discretion accorded him by *N. J. S. A.* 17:46B–45 (a), he would conduct a pre-approval public hearing on the filed rates, which as a matter of fact, represented a generally higher cost for title insurance than previously prevailed.

The public hearing commenced as scheduled on December 15, 1975. At its outset the Public Advocate, supported by other interested parties, applied to the Commissioner for suspension of the filed but not yet approved rates. The Commissioner, persuaded by the oral argument on that application, directed that

> * * * the title insurance companies continue the rate structures and procedures of each individual company in existence prior to the filing until a final determination has been made by the Commissioner of Insurance. All rates when finally determined will be made effective as of a specific prospective date to be announced at the time of determination. [at 48–50]

We affirmed the action taken by the Commissioner. Thereafter, the Rating Bureau suggested to the Commissioner that it was no longer practical to continue with the prior rates and proposed an interim rate structure to achieve "the broad pur-

poses of *N. J. S. A.* 17:46B–1 *et seq.* pending the institution of a statistical reporting system and the collection of data upon which the Commissioner of Insurance can predicate his approval of a 'permanent' rate schedule." In September 1976 the Commissioner solicited from all title insurance companies doing business in the State a "complete list of all rates, fees and charges used at the present time * * * for any and all coverages, endorsements and services, including any and all such charges made by each agent and subagent doing business with your company in New Jersey." An extensive reporting form was included. Upon receipt of the completed forms the Commissioner prepared and sent to all the parties herein a summary of the data contained therein and requested written comments with respect to it. He also forwarded to all parties in January 1978 his own version of an interim rate proposal, "so that you may make the Commissioner aware of any very serious problems which might arise in your view, if an interim rate proposal of this kind is adopted." He advised them, further, that "[t]he interim rates and charges would continue for approximately 2½ years, during which a full two years of experience would be reported under a statistical plan."

Following a meeting in March to discuss the interim rate proposal, the Commissioner distributed a revised proposal, indicating in his forwarding letter that it required further refinement. Drafts of specific items were requested in preparation for the next meeting, which was held in April.

The Commissioner issued his interim rate order on June 15, 1978, effective July 1. It established a schedule of rates on which title insurance premiums were to be calculated, and of fees and charges for various underwriting services. The Rating Bureau informed the Commissioner that it had determined not to appeal the order, and that "[f]or purposes of complying with *N. J. S. A.* 17:46B–41 et seq., you may consider the schedule of interim rates and rating system rules attached to your Order as a filing made by the Bureau on

behalf of its members." The interim rate order was stayed pending the outcome of this appeal.

█ We address first the issue of whether the Commissioner has the authority to adopt interim rates in the absence of an emergent situation. Appellants acknowledge that the Commissioner has such authority in an emergency such as that which was involved in the earlier case, *N. J. Land Title Ins. Rating Bureau v. Sheeran, supra.* They maintain, however, that the rate schedule now adopted by the Commissioner is unlike the rates previously approved by the Commissioner, whose action in that regard was sustained on appeal. They contend that a similar emergency did not exist.

We do not view the Commissioner's interim rate schedule as an emergency measure comparable to the action he had taken late in 1975. At that time the statutory deadline for approving the filed schedule of rates could not be met, so that the only viable alternative was to continue in effect the prior rates charged by insurers until a schedule could be approved pursuant to the mandate of the statute. Here, however, a rate schedule was adopted ostensibly in accordance with the provisions of *N. J. S. A.* 17:46B–45. That the rate order was termed an "interim" one is semantic and of no particular significance. The label was applied not to avoid the statutory requirements, but simply to indicate that empirical knowledge gained during the ensuing two years would lead to that which was referred to as "a final rate approval." The Commissioner explained his purpose in this manner:

The purpose of my approving an interim rate is to allow the collection of expense and claims experience over a minimum period of two years before recommencing proceedings leading to a final rate approval. In this newly regulated industry, where no statistical plan for collection of data was in use, and where diverse forms of doing business existed in the industry, the Department was forced to devise a format for collection of rating data retrospectively with the co-operation of the industry intervenors. The statutory mandates to promote competition, to provide for adequate but not excessive rates and to permit no discrimination, while taking into consideration the past and present practices of a diverse industry

raised many virtually insoluble problems for the Department and for the party intervenors, as did the characteristic fluctuations in volume of business inevitably resulting from economic factors beyond the control of all parties.

 We likewise discern no merit in the next contention that the Commissioner adopted and promulgated his own schedule of rates and fees, instead of approving a schedule submitted by or on behalf of the title insurance companies. It is true that under *N. J. S. A.* 17:46B–42(a) every title insurance company is required to file with the Commissioner its "schedule of fees, every manual of classifications, rules and plans pertaining thereto, and every modification of any of the foregoing which it proposes to use in this State." This obligation may be satisfied by a company's becoming a member of or subscribing to a licensed title insurance rating organization, such as the Rating Bureau, which would make such filings, and by authorizing the Commissioner to accept the same on its behalf. *N. J. S. A.* 17:46B–42(b). The Commissioner makes such review of the rate filings "as may be necessary to carry out the provisions of this act." *N. J. S. A.* 17:46B–42(c).

If the commissioner shall find in his review of rate filings that said filings provide for, result in, or produce rates that are not unreasonably high, and are not inadequate for the safeness and soundness of the insurer, and are not unfairly discriminatory between risks in this State involving essentially the same hazards and expense elements, he shall approve such rates. Prior to such approval the Commissioner may conduct a public hearing with respect to a rate filing. An approval shall continue in effect until the commissioner shall issue an order of disapproval pursuant to the requirements and procedure provided for in subsections b. and c. of this section. [*N. J. S. A.* 17:46B–45(a)]

The procedures outlined above clearly envisage the submission of rate schedules to the Commissioner for his approval rather than having him establish his own rate schedules. We are satisfied, however, that the Commissioner did not act contrary to his authority in issuing the order under

review. As we indicated earlier, it was the Rating Bureau that initially proposed an interim rate structure in August 1976. During the next two years there was a great deal of active study and revision of that proposal and also counter-proposals. All concerned were kept fully informed, their input was received and carefully considered, conferences took place and, as we said, the Commissioner sought and obtained from the title insurance companies as much data as possible to assist him in his difficult task. The Commissioner's final proposal in January 1978 was discussed at a meeting, and the Rating Bureau submitted its own draft in April of that year, emphasizing "that it is the Rating Bureau which makes the rate proposal to the department." But it further stated that if a broadly-based agreement on a rate structure resulted from the on-going discussions, "the Rating Bureau would then adopt this agreement and incorporate it in a Rate Manual which we would file." When the Commissioner issued his interim rate order on June 15, 1978, the Rating Bureau responded by stating that for purposes of complying with *N. J. S. A.* 17:46B–41 *et seq.,* the Commissioner could consider the schedule of rates "as a filing made by the Bureau on behalf of its members."

If the extensive negotiations and discussions, continuing over many months in a cooperative effort to hammer out a rate schedule, did not literally comply with the procedures set forth in the pertinent statute, we are satisfied, nonetheless, that the end result substantially carried out the intent and purpose of the statute, and constituted to all intents and purposes the rate filing contemplated by the statute.

Next, the complaint is voiced that the Commissioner did not hold hearings "as required by the Title Insurance Act of 1974." Appellants contend that no opportunity was afforded for cross-examining witnesses and that there is no transcript or record of the "informal proceedings" that took place. They misconstrue the nature of the proceedings leading to the issuance of the order in question.

The statute, *N. J. S. A.* 17:46B-45(a), plainly states that prior to *approving* a rate filing the Commissioner *may* conduct a public hearing with respect to the filing. In contrast, however, a hearing must be held before an order of disapproval is issued. *N. J. S. A.* 17:46B-45(b). Further, with respect to any filing *which is in effect,* when an aggrieved person or organization makes written application for a hearing thereon, a hearing is required if the Commissioner finds that the application is made in good faith, that the applicant would be aggrieved if the grounds are established and that such grounds otherwise justify such hearing. *N. J. S. A.* 17:46B-45(c).

It is clear that the Commissioner's action in issuing the interim rate order was not mandatorily dependent by statute upon a prior hearing and, in any event, did not require an adjudicative-type hearing including cross-examination of witnesses, findings of fact and a record of the proceedings. As we explained in *In re Matter of Public Hearings,* 142 *N. J. Super.* 136 (App. Div. 1976), certif. den. 72 *N. J.* 457 (1976):

> The elements attendant upon judicial proceedings, including "findings of fact, with the necessary due process elements of examination and cross-examination, are required only when the administrative process is adjudicatory in nature or when the Legislature requires that such findings be made before the agency can act." *Consolidation Coal Co. v. Kandle,* 105 *N. J. Super.* 104, 119 (App. Div. 1969), aff'd 54 *N. J.* 11 (1969) [at 151]

An adjudication is defined in *N. J. A. C.* 15:15-10.1 ("Rules of Administrative Procedure") to be "any and every final determination, decision or order made or rendered in any contested case," and a contested case means

> * * * a proceeding, including any licensing proceeding, in which the legal rights, duties, obligations, privileges, benefits or other legal rights of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing. [*N. J. A. C.* 15:15-10.1.]

 A proceeding such as the one here involved, leading to the approval of a rate schedule, is not adjudicative or *quasi*-judicial. It is unquestionably of a legislative nature and, in the absence of a statutory requirement, a plenary hearing would not be needed. See *In re Port Murray Dairy Co.,* 6 *N. J. Super.* 285, 293 (App. Div. 1950). *Cf. Public Service Coord. Transport v. State,* 5 *N. J.* 196, 214 (1950). In any event, the Commissioner here conducted a series of meetings with the various parties over a period of approximately two years in an effort to reach a consensus with respect to the interim rate schedules. Every interested party was accorded ample opportunity to express its views either *pro* or *con,* and to furnish such information as it deemed necesssary. We are satisfied that this would be tantamount to a legislative-type hearing, even though not formally designated as such. See *Jones v. District of Columbia,* 116 *U. S. App. D. C.* 301, 323 *F.* 2d 306, 308–309 (1963).

As to the requirement for fact-finding, that some degree of it was required of the Commissioner is evident from the provision in *N. J. S. A.* 17:46B–45 that he should approve a rate filing upon a finding in his review thereof "that said filings provide for, result in, or produce rates that are not unreasonably high, and are not inadequate for the safeness and soundness of the insurer, and are not unfairly discriminatory * * *." Such findings were made here and appear in the order issued by the Commissioner.

It should be noted that fact-finding may be required by statute even though an adjudicative-type hearing is not involved. *In re Appeal of Modern Indust. Waste Service,* 153 *N. J. Super.* 232, 240 (App. Div. 1977). But, while "fact finding may be involved in the process, due process requirements of confrontation and cross-examination, the hallmarks of the judicial inquiry, are not necessarily present." *Consolidation Coal Co. v. Kandle, supra,* 105 *N. J. Super.* at 116–117.

We conclude that there were no procedural infirmities in the issuance of the interim rate order under review.

A contention is advanced by the intervenor Association of Real Estate Attorneys that the statute "does not justify the inclusion [in the interim rate order] of any examination charges, closing or settlement charges, escrow services, recording and/or approved attorney examination charges." It is intimated that the unauthorized practice of law is involved, as well as unlawful price fixing. As to the allegation of price fixing, the Rating Bureau correctly points out that the business of insurance is subject to the antitrust laws "to the extent that such business is not regulated by State law." 15 *U. S. C. A.* § 1012(b); see *Commander Leasing Co. v. Transamerica Title Ins. Co.,* 477 *F.* 2d 77 (10 Cir. 1973). See also, *N. J. S. A.* 56:9–5(b). This intervenor also argues that the Legislature "never intended that regulation by the Commissioner address itself to other than rate," that is, the unit charge for the premium. We cannot agree. *N. J. S. A.* 17:46B–42, captioned "Rate Filing," requires every title insurance company, or a rating organization acting on its behalf, to file with the Commissioner for his approval its proposed "schedule of fees, every manual of classifications, rules and plans pertaining thereto, and every modification of the foregoing which it proposes to use in this State." "Fee" for title insurance is defined in *N. J. S. A.* 17:46B–1(f) as meaning and including

* * * the premium for the assumption of the insurance risk, charges for abstracting or searching, examination, determining insurability, and every other charge, whether denominated premium or otherwise, * * * but the term "fee" shall not include any charges paid to and retained by an attorney at law whether or not he is acting as an agent of a title insurance company or an approved attorney.

In considering whether to approve the rate filing, which is inclusive of the foregoing, the Commissioner must be satisfied that it will "provide for, result in or produce" reasonable and nondiscriminatory rates. *N. J. S. A.* 17:46B–45(a). It is incorrect to say that the Commissioner regulates only the "rate" and nothing else on which that rate would necessarily

depend. Finally, we see nothing in the fees and charges here involved that would constitute the illegal practice of law. *Cf. New Jersey Bar Ass'n v. Northern N. J. Mtge. Associates,* 32 *N. J.* 430, 435 (1960).

We turn next to the argument that the Commissioner did not have "sufficient information on which to make prerequisite findings to satisfy *N. J. S. A.* 17:46B–45(a)". It is well established that a presumption of reasonableness attaches to the action of an administrative agency, and the one who challenges the validity of that action has the burden of showing that it was arbitrary, unreasonable or capricious. *In re Matter of Public Hearings, supra,* 142 *N. J. Super.* at 156. That burden has not been met here. We are satisfied from our own study of the record before us that no sound reason exists to interfere with the Commissioner's determination in this regard.

We have carefully considered all the other arguments made by the opponents and find them to be without merit.

In passing, we note that although the Title Insurance Act of 1975 has been in effect nearly four years the Commissioner has yet to promulgage the "reasonable rules and statistical plans" mandated by *N. J. S. A.* 17:46B–49, and such other regulations as he may deem suitable. We would expect the Commissioner to proceed diligently and expeditiously in the matter, so as to implement the regulatory scheme established by the legislature. We would also urge the Commissioner to take such action as may be necessary to produce a "final" rate filing at the earliest practicable date.

The order under review is affirmed.